No. 24-14122

In the

# United States Court of Appeals
## for the Eleventh Circuit

Ralph Benning,
*Plaintiff-Appellee*,

v.

Tyrone Oliver, et al.,
*Defendant-Appellants*.

On Appeal from the United States District Court for the
Middle District of Georgia.
No. 5:18-cv-00087 — Tilman E. Self III, *Judge*

## BRIEF OF DEFENDANT-APPELLANTS

Christopher M. Carr
*Attorney General of Georgia*
Stephen J. Petrany
*Solicitor General*
Elijah J. O'Kelley
*Deputy Solicitor General*

Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Defendant-Appellants*

*Benning v. Oliver*, No. 24-14122

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Anand, Easha, Counsel for Plaintiff-Appellee

Arnold & Porter Kaye Scholer, LLP, Former Counsel for Plaintiff-Appellee

Atreopersaud, Rodney, Former Counsel for Defendant-Appellants

Benning, Ralph H., Plaintiff-Appellee

Bidwell, Anya, Counsel for Amicus Curiae Institute for Justice

Burton, Beth, Deputy Attorney General, Counsel for Defendant-Appellants

Carr, Christopher M., Attorney General, Counsel for Defendant-Appellants

Cato Institute, Former Amicus Curiae

Cavedon, Matthew P., Counsel for Amicus Curiae Cato Institute

Correia, Cristina M., Former Counsel for Defendant-Appellants

Crowder, Elizabeth M., Senior Assistant Attorney General, Counsel for Defendant-Appellants

Davidson, Meghan Robson, Former Counsel for Defendant-Appellants

Dobras, Rebecca J., Former Counsel for Defendant-Appellants

Dozier, Gregory, Former Commissioner of Georgia Department of Corrections

C-1 of 3

*Benning v. Oliver*, No. 24-14122

Edgar, Jennifer, Defendant-Appellant

Fisher, Jeffrey L., Former Counsel for Plaintiff-Appellee

Georgia Department of Corrections

Jaicomo, Patrick, Counsel for Amicus Curiae Institute for Justice

Jones, Robert Stanton, Former Counsel for Plaintiff-Appellee

Institute for Justice, Amicus Curiae

Karlan, Pamela S., Former Counsel for Plaintiff-Appellee

Lones, Laura Louise, Counsel for Defendant-Appellants

Lopez, Janine M., Former Counsel for Plaintiff-Appellee

MacArthur Justice Center, Former Counsel for Plaintiff-Appellee

Miller, Marie, Counsel for Amicus Curiae Institute for Justice

Mullinax, Zachary A., Assistant Attorney General, Counsel for
    Defendant-Appellants

Neily III, Clark M., Counsel for Amicus Curiae Cato Institute

Pacious, Kathleen M., Former Counsel for Defendant-Appellants

Patterson, Margaret, Defendant-Appellant

O'Kelley, Elijah J., Deputy Solicitor General, Counsel for
    Defendant-Appellants

Oliver, Tyrone, Commissioner of Georgia Department of
    Corrections, Defendant-Appellant

Petrany, Stephen J., Solicitor General, Counsel for Defendant-
    Appellants

C-2 of 3

*Benning v. Oliver*, No. 24-14122

Piper, Tina M., Senior Assistant Attorney General, Counsel for Defendant-Appellants

Stanford Law School Supreme Court Litigation Clinic, Former Counsel for Plaintiff-Appellee

Self III, Tilman E., United States District Court Judge

Teaster, Susan E., Former Counsel for Defendant-Appellants

Tutt, Andrew T., Former Counsel for Plaintiff-Appellee

Ward, Timothy, Former Commissioner of Georgia Department of Corrections

Weng, Katie, Former Counsel for Plaintiff-Appellee

Weigle, Charles H., United States Magistrate Judge

No publicly traded company or corporation has an interest in the outcome of this appeal.

/s/ *Elijah J. O'Kelley*
*Counsel for Defendant-Appellants*

C-3 of 3

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant-Appellants request oral argument in this case. The district court committed numerous errors in holding that limitations on who prisoners can email are supposedly unconstitutional. If not corrected, these errors would have significant negative implications for prison administration. The decisional process would be aided by oral argument.

i

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ................................................. i

Table of Authorities .................................................................. iv

Jurisdiction ......................................................................... viii

Statement of Issues ................................................................... 1

Introduction ........................................................................... 2

Statement of the Case ................................................................. 5

    A.  Factual Background ............................................................. 6

    B.  Proceedings Below ............................................................. 10

    C.  Standard of Review ............................................................ 13

Summary of Argument ............................................................... 13

Argument ............................................................................. 16

    I.  The prison's email-contact restriction policy plainly comports with the First Amendment. ............................... 16

        A.  *Turner* provides the applicable standard for reviewing prisoners' constitutional challenges to prison regulations. ................................................................ 17

        B.  The email-contact restriction satisfies *Turner*. ............ 26

            1.  Restricting prisoner email is reasonably related to legitimate penological interests. ............................ 27

            2.  The district court's contrary view is barely colorable. ............................................................... 35

        C.  Even if *Martinez* provided the applicable standard, the email-contact restriction satisfies it. ......................... 44

# TABLE OF CONTENTS
## (continued)

**Page**

II. Benning's procedural due process claim should fail. ......... 48

Conclusion.................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Wolfish*,
441 U.S. 520 (1979) ............................................................... 2, 39

*Benning v. Comm'r, Ga. Dep't of Corr.*,
71 F.4th 1324 (11th Cir. 2023) ........................... 11, 17, 24, 40, 49

*Davila v. Gladden*,
777 F.3d 1198 (11th Cir. 2015) .................................... 37, 41, 42

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
566 U.S. 318 (2012) ..................................................... 30, 34, 40

*Jones v. N.C. Prisoners' Labor Union, Inc.*,
433 U.S. 119 (1977) ................................................................ 36

*Lawson v. Singletary*,
85 F.3d 502 (11th Cir. 1996) .................................................. 45

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................................ 49

*O'Lone v. Estate of Shabazz*,
482 U.S. 342 (1987) .......................................................... 18, 36

*Onishea v. Hopper*,
171 F.3d 1289 (11th Cir. 1999) .............................................. 27

*Overton v. Bazzetta*,
539 U.S. 126 (2003) ................................................................ 26

*Pell v. Procunier*,
417 U.S. 817 (1974) ................................................................ 17

*Perry v. Sec'y, Fla. Dep't of Corr.*,
  664 F.3d 1359 (11th Cir. 2011) ... 3, 14, 18, 20, 23, 24, 28, 31, 33,
  34, 39, 46

*Pesci v. Budz*,
  935 F.3d 1159 (11th Cir. 2019) ......................2, 15, 27, 36, 37, 45

*Pizarro v. Home Depot, Inc.*,
  111 F.4th 1165 (11th Cir. 2024)............................................. 37

*Pope v. Hightower*,
  101 F.3d 1382 (11th Cir. 1996) ...........................4, 15, 27, 32, 48

*Prison Legal News v. Sec'y, Fla. Dep't of Corr.*,
  890 F.3d 954 (11th Cir. 2018) ............ 3, 21, 27, 30, 32, 33, 36, 38

*Procunier v. Martinez*,
  416 U.S. 396 (1974) ............................................5, 12–26, 44–49

*Rodriguez v. Burnside*,
  38 F.4th 1324 (11th Cir. 2022)... 4, 13, 15, 18, 19, 26, 27, 32, 34–
  37, 39, 43

*Sandin v. Conner*,
  515 U.S. 472 (1995) ................................................................ 49

*Shaw v. Murphy*,
  532 U.S. 223 (2001) .....................................................1, 5, 13, 19

*Simpson v. Cnty. of Cape Girardeau*,
  879 F.3d 273 (8th Cir. 2018) ................................................. 33

*Thornburgh v. Abbott*,
  490 U.S. 401 (1989) .............. 14, 20, 22, 23, 25, 28, 44–46, 48, 49

*Turner v. Safley*,
  482 U.S. 78 (1987) ...... 1, 2, 12–23, 25, 26, 28, 32, 34–36, 38, 39,
  41, 42, 44, 45

*Washington v. Harper*,
  494 U.S. 210 (1990) ...................................................... 19

*Williams v. United States*,
  985 F.3d 813 (11th Cir. 2021) ................................................ 37

**Other Sources**

*Benning v. Amideo*,
  No. 6:02-cv-139 (S.D. Ga. Dec. 18, 2002) .................................... 9

*Benning v. Brady*,
  No. 6:00-cv-27 (S.D. Ga. Mar. 22, 2000) .................................... 9

*Benning v. Deal*,
  No. 1:17-cv-152 (M.D. Ga. Aug. 9, 2017).................................... 9

*Benning v. Dep't of Corr.*,
  No. 5:14-cv-389 (M.D. Ga. Sept. 26, 2014).................................. 9

*Benning v. Garner*,
  No. 1:98-cv-3690 (N.D. Ga. Dec. 28, 1998).................................. 9

*Benning v. Georgia*,
  No. 5:08-cv-435 (M.D. Ga. Dec. 12, 2008) ................................... 9

*Benning v. Hall*,
  No. 6:01-cv-31 (S.D. Ga. Feb. 28, 2001) ..................................... 9

*Benning v. Jester*,
  No. 6:94-cv-180 (S.D. Ga. Nov. 22, 1994).................................... 9

*Benning v. Med. Coll. of Ga.*,
  No. 1:03-cv-108 (S.D. Ga. July 14, 2003) .................................... 9

*Benning v. Wetherington*,
  No. 6:03-cv-51 (S.D. Ga. Apr. 30, 2003) ..................................... 9

vi

Danny Robbins & Carrie Teegardin, *From the Inside: Criminal Kingpins*, Atlanta Journal-Constitution (Dec. 28, 2023) ........................................................................ 28

Frank D. LoMonte & Jessica Terkovich, *Orange is the New Blackout: The First Amendment and Media Access to Jails*, 104 Marq. L. Rev. 1093 (2021)......................... 29

Karen J. Hartman, Legislative Review, *Prison Walls and Firewalls: H.B. 2376—Arizona Denies Inmates Access to the Internet*, 32 Ariz. St. L.J. 1423 (2000) ............29, 30

Titia A. Holtz, Note, *Reaching Out from Behind Bars: The Constitutionality of Laws Barring Prisoners from the Internet*, 67 Brooklyn L. Rev. 855 (2002) ................... 30

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellee Ralph Benning asserted First and Fourteenth Amendment claims under 42 U.S.C. § 1983 challenging certain prison policies.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court issued a final order and injunctive and declaratory relief as to the challenged prison policies.

This appeal is timely because the district court entered judgment on November 18, 2024, and Defendant-Appellants timely filed a notice of appeal on December 17, 2024.

## STATEMENT OF ISSUES

1.    *Turner v. Safley*, 482 U.S. 78, 89 (1987), provides the "unitary … standard for reviewing prisoners' constitutional claims" and "the test for evaluating prisoners' First Amendment challenges" to prison rules.  *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001).  Did the district court err in applying a different standard to prisoner Ralph Benning's First Amendment challenge of a prison rule regarding access to email?

2.    To succeed on a constitutional challenge against a prison regulation, a prisoner must show that the regulation is not "reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.  Did the district court err in ruling that it is irrational to limit prisoners to emailing people who have been approved for in-person visits?

1

## INTRODUCTION

The Supreme Court has unambiguously and repeatedly forbidden courts from armchair coaching prison administration. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 562 (1979). This Court has put pith to the principle, saying courts may not "sit as a super-warden to second-guess the decisions of the real wardens." *Pesci v. Budz*, 935 F.3d 1159, 1167 (11th Cir. 2019) (quotation omitted). That principle comes from the core of our constitutional order: the "separation of powers." *Turner*, 482 U.S. at 85. "[U]nder the Constitution, the first question to be answered is not whose plan [for prison administration] is best, but in what branch of the Government is lodged the authority to initially devise the plan." *Bell*, 441 U.S. at 562. That branch is not the judiciary—prison administration is instead "peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85. And federal judges must be even more deferential to prison officials when reviewing a *state* penal system. *E.g., id.*

The district court ignored those principles here when it enjoined a prison rule that limits prisoners to emailing only people who have been approved to visit the prisoner in person. To become an approved visitor, a person must be the inmate's family member or a close associate who is likely to help their

2

rehabilitation, and the person must apply for visitation rights and be approved by the prison warden. Inmate Ralph Benning challenged that email-contact restriction because he thinks the First Amendment requires prisons to let him email anyone in the world except for people who have specifically requested not to be emailed by him. *See* Doc. 28 at 13. Inexplicably, the district court agreed with him.

The First Amendment does not require anything close to what the district court ordered here. The email-contact restriction is reasonably related to legitimate, indeed "paramount," penological interests in prison safety, public safety, and the allocation of prison resources. *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 967 (11th Cir. 2018). Letting prisoners email anyone they want would create extensive risk, as prisoners could target specific victims or co-conspirators and cast wide nets for *potential* victims and co-conspirators. They could use email to attempt a variety of criminal behavior, ranging from fraud to bribery to blackmail to extortion to harassment to coordinating violence inside and outside the prison to planning escapes and more. *See, e.g.*, *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1365–66 (11th Cir. 2011).

Restricting emails to pre-approved family members and rehabilitative close associates reduces the likelihood that prisoners will misuse email. That alone establishes a connection sufficient to uphold the restriction. *See, e.g.*, *Rodriguez v. Burnside*, 38 F.4th 1324, 1333 (11th Cir. 2022). Tellingly, the email-contact restriction at issue here is similar to the kind of restriction this Court long ago upheld: a prison rule restricting prisoners to *calling* only 10 people who would be approved only after a criminal background check. *See Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996). That should be the end of the matter.

The district court's contrary view was based on its own *ipse dixit* that emails are just the same as physical, handwritten, snail-mail letters. Doc. 175 at 17–18, 22. That is obviously not true, especially when it comes to prison security concerns. Worse still, the district court dismissed all security concerns based on its unsupported speculation that screening emails for key words "*should* be enough to" keep prisons and the public safe. *Id.* at 22 (emphasis added); *see also id.* at 19. Even if the Constitution allowed the district court to make that uncertain guess, there is no record evidence to support it, nor is it plausible. Benning's own evidence showed that a prisoner's sister simply used words like

4

"kun" in an email to avoid the prison software's detection of the word "gun." Doc. 80-6 at 2.

Although it should not matter, the district court also got the applicable legal standard wrong. The court applied a form of strict scrutiny, relying on *Procunier v. Martinez*, 416 U.S. 396 (1974), Doc. 175 at 13–16, even though the Supreme Court has overruled the relevant portion of *Martinez* and replaced it with *Turner*'s "*unitary*, deferential … test for evaluating prisoners' First Amendment challenges," *Shaw*, 532 U.S. at 229–30 (emphasis added). Moreover, *Martinez* did not involve the sort of strict-scrutiny analysis the district court imported here—at most, *Martinez* involves an ever-so-slightly heightened standard of review, which the prison email policy would still easily satisfy.

At bottom, the district court ordered that Georgia prisons must let prisoners email anyone they choose because restricting who they can email is supposedly *irrational*. This Court should reverse.

## STATEMENT OF THE CASE

Plaintiff Ralph Benning sued the Georgia Department of Corrections Commissioner and prison officials Jennifer Edgar and Margaret Patterson, alleging violations of his First Amendment and due process rights based on restrictions to his email access.

5

The district court initially ruled that Benning's due process claim failed and that his First Amendment challenge to the email-contact restriction was moot. Without addressing the email-contact restriction, a panel of this Court held that Benning could potentially obtain injunctive relief on his due process claim and remanded for fact finding and a determination of the scope of relief. On remand, the district court allowed Benning to revive his First Amendment challenge to the email-contact restriction, and it awarded Benning injunctive and declaratory relief on that claim and the due process claim.

## A. Factual Background

Since at least 2015, the Georgia Department of Corrections has allowed inmates to send electronic correspondence—email—subject to certain limitations. Doc. 73-1 at 54–56. Inmates can send emails through kiosks and mobile tablets. *See* Doc. 156-1 at 1. Kiosk and tablet use is "a privilege and not a right," and is subject to limitations articulated in Standard Operating Procedure 204.10. *Id.* Procedure 204.10 prohibits inmates from sending emails that, among other things, request they "be forwarded, sent, or mailed to others," or "request information about another offender or send information on behalf of another offender." *Id.* at 8. The Procedure also notifies inmates "that

6

communications which violate this policy will be intercepted (censored) without notice or explanation." *Id.* at 9. Inmates must agree to Procedure 204.10's restrictions to use the kiosks and tablets. *Id.* at 12.

Procedure 204.10 also contains an email-contact restriction that limits inmates to emailing up to 12 people who have been approved by the prison warden to visit them in person. *Id.* at 2–3; *see also* Doc. 156-3. To be approved for in-person visitation, a person typically must be the inmate's family member, but the inmate can also have two approved visitors with whom he has a "significant relationship." Doc. 156-5 at 2, 11. A "significant relationship" can include close associates whom the warden has found have the potential to help the inmate's rehabilitation. *Id.* People with recent criminal records and victims or witnesses associated with the inmate's criminal history, among others, are generally prohibited from visiting an inmate. *Id.* at 8–9. Also, a would-be visitor must apply for approval by completing a written form, and doing so requires consent to annual background or criminal history checks. *Id.* at 7, 9. The Department initially promulgated the email-contact restriction in September 2018, but paused enforcement until late 2022. Doc. 156 at 2–3.

All outgoing inmate emails are filtered through the Department's Central Intelligence Unit, where they are electronically screened for a list of key words. Doc. 64-4 at 5. The list of key words is confidential, but it includes at least obvious words related to criminality like gangs, blood, methamphetamine, tobacco, money laundering, and "zip" (a common slang term for marijuana). *Id.* at 6; Doc. 64-5 at 3; Doc. 64-6 at 3. Emails that don't contain key words are automatically released to the recipient, while emails with key words are flagged for manual review. Doc. 64-4 at 5. An analyst reviews every flagged email for compliance with Procedure 204.10. *Id.* The analyst then releases compliant emails to the recipient and withholds noncompliant emails. *Id.* It is "[o]ften" the case that an email "contain[s] a key wor[d] but in an innocuous context," in which case the reviewing analyst "would release that email to the recipient." *Id.*

Benning is serving a life sentence for murder. Doc. 64-3 at 20, 22. He briefly served in the Navy but was removed from the service after, in his own words, "seeking revenge on the people that killed [his] family." *Id.* at 21. Shortly after being forced out of the Navy, Benning was convicted of murdering an eight-year-old boy after torturing the child. *See* Doc. 73-6 at 27, 32. He has been incarcerated since 1986, and in that time he has personally

8

prepared and filed at least ten civil lawsuits against various defendants.  Doc. 64-3 at 19, 23.[1]

In 2016, Benning was incarcerated at Wilcox State Prison. *Id.* at 36.  He arrived at Wilcox with a Department-issued tablet from a previous prison assignment. *Id.* at 40.  In late 2017 and early 2018, Benning sent certain emails to his sister and a nonprofit organization that were intercepted by prison officials and withheld because the emails either requested the recipient to forward it or contained information about other inmates.  *See* Doc. 64-4 at 21; Doc. 64-5 at 11; Doc. 64-6 at 7.  Also, although Benning has only seven people on his visitation list out of a possible 12, he wishes to email people who are not on his visitation list.  *See* Doc. 156 at 3.

---

[1] *See Benning v. Jester*, No. 6:94-cv-180 (S.D. Ga. Nov. 22, 1994); *Benning v. Garner*, No. 1:98-cv-3690 (N.D. Ga. Dec. 28, 1998); *Benning v. Brady*, No. 6:00-cv-27 (S.D. Ga. Mar. 22, 2000); *Benning v. Hall*, No. 6:01-cv-31 (S.D. Ga. Feb. 28, 2001); *Benning v. Amideo*, No. 6:02-cv-139 (S.D. Ga. Dec. 18, 2002); *Benning v. Med. Coll. of Ga.*, No. 1:03-cv-108 (S.D. Ga. July 14, 2003); *Benning v. Wetherington*, No. 6:03-cv-51 (S.D. Ga. Apr. 30, 2003); *Benning v. Georgia*, No. 5:08-cv-435 (M.D. Ga. Dec. 12, 2008); *Benning v. Dep't of Corr.*, No. 5:14-cv-389 (M.D. Ga. Sept. 26, 2014); *Benning v. Deal*, No. 1:17-cv-152 (M.D. Ga. Aug. 9, 2017).

### B. Proceedings Below

Benning filed a complaint against the Department Commissioner (now Tyrone Oliver)[2] and two Department analysts (Jennifer Edgar and Margaret Patterson) who had stopped some of his emails from being delivered to their recipients because the emails contained content prohibited by prison policy. *See* Doc. 1; Doc. 28. The complaint raised a First Amendment challenge to the content-prohibitions (although those are no longer at issue) and a due process challenge based on Procedure 204.10 allowing prison officials to censor Benning's outgoing emails without giving him notice and an opportunity to appeal. *Id.*

Several months after Benning filed the complaint, the Department adopted a revised Procedure 204.10 that included the email-contact restriction. Benning then filed an amended complaint to challenge the email-contact restriction. *See* Doc. 28 at 12. He asked the court to "[o]rder the defendants to allow [him] to email anyone except for persons who have specifically requested to" not be emailed by him. *Id.* at 13. He also sought damages based on the alleged censorship, along with a declaration that email correspondence be considered the same as physical letters

---

[2] The Commissioner at the time the suit was filed was Gregory Dozier. *See* Doc. 156 at 1. As the current Commissioner, Oliver was automatically substituted. Doc. 175 at 1 n.1.

10

and that he have notice and an appeal when his emails were censored. *Id.* at 6, 13. The district court eventually granted summary judgment to the prison officials while also ruling the email-contact restriction challenge was moot because the Department was not enforcing it. Doc. 108 at 7, 29.

Benning appealed and a panel of this Court affirmed in part and reversed in part. *See Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F.4th 1324 (11th Cir. 2023). On Benning's First Amendment claims, and as relevant now, this Court did not address the email-contact restriction because the Department had stopped enforcing it. *Id.* at 1339. On Benning's due process claims, the Court held that Benning had sufficiently alleged a due-process-based constitutional violation but that qualified immunity barred damages. *Id.* at 1333–34. This Court reasoned that "email is a form of correspondence," *id.* at 1332, and concluded that Benning has a liberty interest, "grounded in the First Amendment" in sending emails, *id.* at 1330. Benning was thus entitled to particularized notice of each withheld email, "a reasonable opportunity to protest that decision," and referral to a "prison official other than the [one] who originally disapproved" the email. *Id.* at 1332 (quotation omitted). The Court remanded, stating that the "due process claims will have to be put to a jury so that the

11

district court can address the propriety (and scope) of declaratory relief should Mr. Benning prevail." *Id.* at 1335.

On remand, the parties jointly stipulated certain facts so the district court could enter declaratory relief on Benning's due process claim. *See* Doc. 164; Doc. 156. The district court entered a final order adopting what the panel of this Court had held about the due process claim. *See* Doc. 175 at 28.

As for the email-contact restriction, the district court allowed Benning to revive his First Amendment challenge because the Department had begun enforcing it again. *See* Doc. 132. On cross-motions for summary judgment, the district court ruled that the email-contact restriction violates the First Amendment. The court initially determined that it should apply a least restrictive means test from *Martinez*, which held invalid a prison policy of censoring prisoner complaints about prison officials, 416 U.S. at 415, instead of the reasonableness review from *Turner*. *See* Doc. 175 at 14–16. And it ruled the email-contact restriction does not satisfy *Martinez*. *Id.* at 20. Alternatively, the district court ruled that the email-contact restriction does not satisfy the *Turner* reasonableness standard. *Id.* at 20–24. After concluding the factors for injunctive relief and the Prison Litigation Reform Act factors favored Benning, the court enjoined the email-contact

12

restriction, requiring the Department to treat emails the same as handwritten letters. *Id.* at 25–28.

### C.   Standard of Review

This Court reviews *de novo* the district court's summary judgment decision. *Rodriguez*, 38 F.4th at 1330.

## SUMMARY OF ARGUMENT

Benning—a prisoner—raises a First Amendment challenge, and "*Turner* provides the test for evaluating prisoners' First Amendment challenges." *Shaw*, 532 U.S. at 230. *Turner* requires courts to hold that a prison "regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Restricting who inmates can email is reasonably related to several legitimate penological interests, including reducing the opportunity for inmates to use email for illicit purposes. Nonetheless, the district court concluded *Turner* doesn't apply, that the email-contact restriction does not satisfy heightened scrutiny, and that it does not even satisfy *Turner*.

In the first place, the district court wrongly thought that some undefined heightened standard from *Martinez* applied instead of the well-trod *Turner* standard. *Martinez* was a case involving the censorship of outgoing prisoner letters that merely complained

13

about the prison without posing any security concerns.  416 U.S. at 415.  The district court thought *Martinez* applied because emails are outgoing correspondence and the Supreme Court once stated that *Martinez* is "limited to regulations concerning outgoing correspondence."  *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).  But that *limitation* was not meant to elevate *Martinez* into a standard that applies, *per se*, to all outgoing correspondence.  This Court has already recognized that *Martinez* is inapplicable where the outgoing correspondence is "distinguishable from the correspondence in *Martinez*" because it poses security concerns.  *Perry*, 664 F.3d at 1365.  The emails restricted by the email-contact restriction *do* pose security concerns, so *Martinez* does not apply.  *Turner* does.

The email-contact restriction easily satisfies *Turner*—and any standard from *Martinez*, for that matter.  Emails can be used by prisoners for a variety of illegal behavior, and they can easily be filled with code language that simple automated screening methods will not detect.  *See* Doc. 80-6 at 2.  Unlike physical letters, emails can be produced, reproduced, and forwarded rapidly, which could allow prisoners to slip illicit content past prison officials or even intentionally flood screening systems.  The email-contact restriction limits prisoners to emailing only certain

14

family members and people the warden has approved as likely to help with the prisoners' rehabilitation. Those people are less likely to engage in email exchanges with the prisoner that may result in unlawful behavior. The restriction thus reduces the chances of inmates using email improperly, and that alone satisfies judicial scrutiny. *See, e.g.*, *Rodriguez*, 38 F.4th at 1333; *Pope*, 101 F.3d at 1385.

The district court ruled that the email-contact restriction fails under *Martinez*, or alternatively, under *Turner*. Both conclusions were plagued by the same fundamental errors. One error was that the district court improperly shifted the burden to the Commissioner, even though the "the burden 'is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.'" *Pesci*, 935 F.3d at 1166 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). Another error was the district court assuming that there is no "meaningful difference between letters and emails." Doc. 175 at 20. That overlooks all the ways in which emails can more quickly be disseminated than physical letters and all the ways emails pose security threats that letters do not. Worst of all, the district court guessed—without the benefit of any record support—that simply screening emails for key words "*should* be enough to alleviate" the Commissioner's security

15

concerns.  *Id.* at 22 (emphasis added).  That speculation is unsupported and unsupportable.  It also tramples on the deference judges must give to prisoner administrators.  If anything, Benning's own evidence shows that prisoners and their correspondents can circumvent key word screening.  *See* Doc. 80-6 at 2.  While that circumvention may be less concerning when a prisoner is emailing his sister, it is a significant concern when a prisoner is emailing a potential victim or co-conspirator.

*Turner* applies, and the email-contact restriction satisfies it.  But even if some undefined heightened standard from *Martinez* applies, the email-contact restriction satisfies that, too.  This Court should reverse.

## ARGUMENT

### I.   The prison's email-contact restriction policy plainly comports with the First Amendment.

A restriction on whom prisoners can email is plainly constitutional, and the district court erred on every level in holding otherwise.  In the first place, it applied the wrong legal standard, subjecting the email-contact restriction to an unduly heightened form of scrutiny instead of the *Turner* reasonableness standard.  Under the correct standard, the email-contact restriction easily passes muster.  But even if some heightened

16

form of review applied, the email-contact restriction would satisfy it.

### A. *Turner* provides the applicable standard for reviewing prisoners' constitutional challenges to prison regulations.

At the outset is the question of the standard under which this Court should review the email-contact restriction.[3]  It is common ground that prisoners do not have the same constitutional freedoms as ordinary citizens.  *See, e.g.*, *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  And the Supreme Court has held that, as a general matter, prison policies must merely be reasonable, even when they would be invalid as applied to non-prisoners.  In *Turner*, the Court held that in "prisoners' rights" cases, the applicable standard asks whether the prison regulation is reasonably related to legitimate penological interests.  482 U.S. at 85–86, 89.  Ever since, the Supreme Court (and this Court) have repeatedly applied *Turner* to challenges of prison policies.

The district court instead relied on *Martinez*, 416 U.S. at 413, a one-off case (decided years prior to *Turner* and since largely

---

[3] Even before that is the threshold issue of whether Benning has a First Amendment right to send emails at all.  The prison officials dispute that he does, and they preserve that issue for any *en banc* review.  But they do not contest the point at this stage given the prior panel's decision in *Benning*, 71 F.4th at 1330.

17

overruled) where the Supreme Court held invalid a prison policy that censored prisoner correspondence that simply *complained* about the prison. From *Martinez*, the district court drew the conclusion that a least-restrictive-means test applies to limitations on outgoing email. But *Martinez* doesn't apply at all, much less require a least-restrictive-means test.

**1.** Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. It is a form of rational-basis review, *see Perry*, 664 F.3d at 1365, that by explicit design is "less restrictive than that [test] ordinarily applied to alleged infringements of fundamental constitutional rights," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). *Turner* "ensure[s] that courts afford appropriate deference to prison officials," *id.*, and that deference is not a mere judicial policy position—it is deference required by the Constitution itself and "separation of powers concerns," *Turner*, 482 U.S. at 85. Not only that, but when federal courts are reviewing "a state penal system, principles of federalism bolster that deference." *Rodriguez*, 38 F.4th at 1330 (quotation omitted).

The Supreme Court has instructed that *Turner* provides the "unitary, deferential standard for reviewing prisoners'

18

constitutional claims." *Shaw*, 532 U.S. at 229; *see also Rodriguez*, 38 F.4th at 1330 (same). That includes First Amendment claims—all of them. A unanimous Supreme Court has said as much: "*Turner* provides the test for evaluating prisoners' First Amendment challenges." *Shaw*, 532 U.S. at 230. The Supreme Court has been unambiguous that *Turner* "appl[ies] in *all cases* in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment." *Washington v. Harper*, 494 U.S. 210, 224 (1990) (emphasis added). The Court has even been clear that it has been clear, stating: "We made quite clear that the standard of review we adopted in *Turner* applies to *all circumstances* in which the needs of prison administration implicate constitutional rights." *Id.* (emphasis added). There are no qualifiers in any of that language.

Because Benning is a prisoner who claims that a prison rule violates his constitutional right, *Turner* applies. It should be that simple.

**2.** Despite precedent after precedent holding that *Turner* is the "unitary" standard for all prisoner constitutional rights claims, *see Shaw*, 532 U.S. at 229, the district court still applied a purportedly heightened standard from *Martinez*, Doc. 175 at 14.

19

But the "*Martinez* standard was only applied once by the Supreme Court—in *Martinez* itself." *Perry*, 664 F.3d at 1365. That is unsurprising considering that the Supreme Court has neutered *Martinez*—and the idea of subjecting prison regulations to strict judicial review—in every meaningful way. *See Thornburgh*, 490 U.S. at 409–10; *Turner*, 482 U.S. at 93 n.\*.

*Martinez* held unlawful a standardless, content-based regulation that prohibited inmates from complaining about the prison, even when those complaints posed no safety concerns. 416 U.S. at 399–400. The rule prohibited inmates from sending letters that "unduly complain[ed]" or "magnif[ied] grivances," that expressed "inflammatory political, racial, religious or other views," or that were "lewd, obscene, or defamatory" or "otherwise inappropriate." *Id.* Prison officials were given no "further criteria" to help them "decide whether a particular letter contravened any prison" policy. *Id.* at 400. Those "regulations fairly invited prison officials … to apply their own personal prejudices and opinions as standards for prisoner mail censorship." *Id.* at 415. And prison officials used that "extraordinary latitude" to "suppress unwelcome criticism" without any safety concerns. *Id.* Most tellingly, the prison officials' argument was not "that the regulations [were] justified

20

by a legitimate governmental interest but that they did not need to be." *Id.* And the prison officials generally failed to explain how the prohibited correspondence posed any safety issues. *See id.* at 416.

All of that is unlike this case in every notable way. The email-contact restriction is not content-based, much less without providing any actual standards and being subject to prison guards' prejudicial whims. Nor is the email-contact restriction targeted at undangerous communications that pose no safety concerns. Quite the opposite: the email-contact restriction is about prophylactically limiting opportunities for prisoners to coordinate illegal activity (both inside and outside the prison), limiting harassment, blackmail, and bribery, and limiting opportunities for prisoners to overwhelm prison resources and screening methods. *See infra* at 27–32. Unlike in *Martinez*, the government's interest in combatting those dangers is "paramount." *Prison Legal News*, 890 F.3d at 967. If all that weren't enough, it is crucial that emails pose a categorically different level of concern than the physical letters at issue in *Martinez*.

The district court ignored all those points in favor of a dichotomy: everything is reviewed under *Turner*, but restrictions on outgoing correspondence get *Martinez*. Doc. 175 at 14–15. The

21

district court thought that because the Supreme Court has stated *Martinez* is "limited to regulations concerning outgoing correspondence," *Thornburgh*, 490 U.S. at 413, *Martinez*'s standard must apply, per se, to *all* outgoing correspondence. Doc. 175 at 14–15. That is a misreading of *Thornburgh*, not to mention *Turner* and other cases as well.

For starters, just as a matter of reading judicial opinions, a court saying that *Martinez* is *limited* to regulations about outgoing correspondence is not the same as saying that *all* regulations about outgoing correspondence are subject to *Martinez*. And nothing in *Thornburgh* (which overruled *Martinez* in most respects) suggests that the Supreme Court elevated *Martinez* into the latter expansive category.

Moreover, *Thornburgh* construed *Martinez* as turning on the lack of government interest, not the lack of tailoring or on any specific tailoring standard. The Court said so, explaining that *Martinez*'s holding did *not* "result[] … from a least restrictive means requirement," but instead turned on "the nature of the asserted governmental interest." *Thornburgh*, 490 U.S. at 411–12. That interest fell short because the letters prohibited in *Martinez* could not "reasonably be expected to present a danger" to the prison. *Id.* Indeed, to reiterate, the prison officials in

22

*Martinez* did not even argue "that the regulations [were] justified by a legitimate governmental interest."  416 U.S. at 415.  The context shows *Martinez* applies to (at most) outgoing correspondence that does not implicate a prison's interest in safety.  But it is not an enduring standard for all prison regulations of all outgoing correspondence.  *See Thornburgh*, 490 U.S. at 411; *Turner*, 482 U.S. at 93 n.*.

This Court has already recognized that *Martinez* is not a per se standard for *all* outgoing correspondence.  *See Perry*, 664 F.3d at 1365.  In *Perry*, this Court upheld a prison regulation prohibiting inmates from using a company to solicit pen pals.  *Id.* at 1362.  Although that prohibition implicated outgoing correspondence, *Martinez* was inapplicable because the "outgoing correspondence" in *Perry* was "distinguishable from the correspondence in *Martinez*."  *Id.* at 1365.  It would make no sense to distinguish types of outgoing correspondence if *Martinez* applies to *all* outgoing correspondence.  And the correspondence in *Perry* was distinguishable because it *did* pose a threat to prison security: prisoners could obtain money from pen pals for use in bribing officials or coordinating violence.  *Id.*  Outgoing emails implicate those same security concerns, plus many more, *see infra* at 27–32, so *Martinez* does not apply.

23

The outgoing correspondence in this case is also "distinguishable from the correspondence in *Martinez*," *Perry*, 664 F.3d at 1365, because emails and letters cannot be equated. Emails present a host of security concerns that letters just don't. *See infra* at 29–32. Those security concerns are worlds away from the content-based regulation of anodyne prison complaints at issue in *Martinez*. 416 U.S. at 415. Nor does the prior panel's decision in this case say otherwise. This Court said it "seems" that "the rationale of *Martinez* is concerned with correspondence from inmates, regardless of the form (or medium) the correspondence takes." *Benning*, 71 F.4th at 1330. But that was about only whether prisoners have a liberty interest in sending emails *at all*. The Court did not address the entirely separate question of what standard of review applies to regulations affecting that purported right.

The district court offered a couple more reasons why *Martinez* should apply, but they are not valid. The district court thought it relevant that *Martinez* involved prison regulations that could "inhibit[] the first amendment rights of persons wishing to correspond with inmates"—or nonprisoners. Doc. 175 at 15 (quoting *Guajardo v. Estelle*, 580 F.2d 748, 754 (5th Cir. 1978)). The problem with that point is the Supreme Court repudiated it

24

35 years ago. The Court pointed out that *Martinez* "took special note … of the fact that the rights of nonprisoners were at issue." *Thornburgh*, 490 U.S. at 410 n.9. Then the Court said that was wrong: "any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with [the Supreme Court's] intervening decisions." *Id.* Those intervening decisions also "involved regulations that affected rights of prisoners *and* outsiders." *Id.* Yet *Turner* review applied across the board. *Id.*

The district court also noted the Supreme Court's statement that the "implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." Doc. 175 at 15 (quoting *Thornburgh*, 490 U.S. at 413). But again, that language cannot be stripped from its context: correspondence that posed no security threats. Not only that, but *Martinez* involved physical letters, which do not pose the same problems as emails. Whatever may be "categorically" true about physical letters does not apply "categorically" to the much different category of emails.

And again, remember: the Supreme Court has *repeatedly held* that *Turner* is the exclusive standard for these prisoner challenges to prison regulations. If *anything* is left of *Martinez* (itself a

25

debatable proposition), its pre-*Turner* analysis is certainly not it. *Turner* provides the applicable standard, not *Martinez*.

## B.    The email-contact restriction satisfies *Turner*.

As noted, *Turner* requires that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. at 89.  There are "four factors that frame [the] analysis." *Rodriguez*, 38 F.4th at 1330.  First, "whether the regulation has a valid, rational connection to a legitimate governmental interest." *Overton*, 539 U.S. at 132 (quotation omitted).  Second, "whether alternative means are open to inmates to exercise the asserted right."  *Id.*  Third, "what impact an accommodation of the right would have on guards and inmates and prison resources."  *Id.* And fourth, "whether there are ready alternatives to the regulation."  *Id.* (quotation omitted).

Importantly, those factors are not a balancing test and this Court does not determine "if some outweigh the others." *Rodriguez*, 38 F.4th at 1331.  The last three "factors" are merely "more angles from which to view the fundamental inquiry:" whether there is a rational connection between the regulation and the government interest.  *Id.*  If that "connection exists, the policy

26

will stand." *Id.* In short, the "prison regulation need only be reasonable." *Id.* at 1333.

Additionally, "the burden 'is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.'" *Pesci*, 935 F.3d at 1166 (quoting *Overton*, 539 U.S. at 132). Benning comes nowhere close to carrying his burden.

### 1. Restricting prisoner email is reasonably related to legitimate penological interests.

**a.** The Department has undisputed interests in "prison security and public safety," and those "interests are not only legitimate, but paramount." *Prison Legal News*, 890 F.3d at 967; *see also Rodriguez*, 38 F.4th at 1331 ("No doubt that … promoting prison security is perhaps the most legitimate of penological goals.") (quotation omitted). Also, "[r]eduction of criminal activity and harassment qualifies as a legitimate governmental objective." *Pope*, 101 F.3d at 1385. Not only that, but the "Supreme Court has long recognized that prisons make do with 'limited resources for preserving institutional order' and thus deserve deference in how they allocate those resources." *Rodriguez*, 38 F.4th at 1331 (quoting *Turner*, 482 U.S. at 90); *see also Onishea v. Hopper*, 171 F.3d 1289, 1300 (11th Cir. 1999) (en banc) ("cost" is a legitimate penological concern).

27

The email-contact restriction is reasonably related to (at least) prison security, public safety, reducing crime and harassment, and the Department's interest in allocating resources and avoiding undue costs.  Courts have repeatedly recognized the obvious dangers of prisoners communicating with people outside the prison.  As a general matter, the Supreme Court "has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."  *Thornburgh*, 490 U.S. at 407–08.  Outgoing communications can facilitate money transfers to "bribe officials and order hits on other inmates," *Perry*, 664 F.3d at 1365, or coordinate violence against people outside the prison, *see* Danny Robbins & Carrie Teegardin, *From the Inside: Criminal Kingpins*, Atlanta Journal-Constitution (Dec. 28, 2023), https://www.ajc.com/news/investigations/prisons-kingpins/.

Outgoing communications can be used to defraud people.  *See Perry*, 664 F.3d at 1363.  "Dangerous outgoing correspondence" can "include escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion."  *Thornburgh*, 490 U.S. at 412.  It can be used to "arrange assaults and other violent acts."  *Turner*, 482 U.S. at 91.  And it can be used to harass people

28

who don't want to hear from prisoners, including crime victims. *See* Frank D. LoMonte & Jessica Terkovich, *Orange is the New Blackout: The First Amendment and Media Access to Jails*, 104 Marq. L. Rev. 1093, 1146 (2021).  That danger poses a special risk to child victims, *id.*, which is no abstract concern considering Benning tortured an eight-year-old, *see* Doc. 73-6 at 27, 32.

Email exacerbates all those concerns.  Unlike physical letters, email provides the opportunity to contact countless people rapidly. Even advocates for greater email access in prison acknowledge that "[e]mail, unlike paper mail, is almost immediate and requires virtually no human intervention between sending and delivery." Karen J. Hartman, Legislative Review, *Prison Walls and Firewalls: H.B. 2376—Arizona Denies Inmates Access to the Internet*, 32 Ariz. St. L.J. 1423, 1433 (2000).  The immediacy of delivery is not the only problem—the ease of preparation is, too. Where a physical letter, even a short one, takes time to write, seal, and deposit in the mail, email composition is limited only by a prisoner's typing speed.  And an email of virtually any length can be quickly reproduced with a copy-and-paste function.  Even more, unlike a physical letter, a single email can be forwarded to countless recipients instantaneously, with no copying or postage costs.

The takeaway is undeniable: "it is much more difficult to monitor [email] than paper mail." *Id.* And the difficulties of screening an increased volume of email are especially problematic considering that prison officials already struggle to monitor physical prison mail. *See, e.g.*, Titia A. Holtz, Note, *Reaching Out from Behind Bars: The Constitutionality of Laws Barring Prisoners from the Internet*, 67 Brooklyn L. Rev. 855, 891 n.222 (2002) (at California's Pelican Bay prison, officials must individually screen each one of the "two to five thousand pieces of [physical] mail" opened every weekday). Prison officials could easily be overwhelmed reviewing so many outgoing emails that they cannot effectively identify harmful ones. Indeed, that possibility would undoubtedly enter prisoners' minds as a strategy to intentionally flood screening systems. "Inmates would adapt to any pattern or loopholes they discovered in the [email] protocol and then undermine the security of the institution." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012); *see also Prison Legal News*, 890 F.3d at 959 (noting how prisoners would blow into phone receivers to thwart detection of three-way phone calls).

Emails from prisoners are also a threat to public safety. Allowing prisoners to email everyone gives them a tool for casting

a wide net for fraud, blackmail, or harassment victims.  This Court, by comparison, addressed a similar problem posed by a company that solicited pen pals for prisoners "by sending a list of inmates seeking pen pals to individuals or groups who also seek a pen pal."  *Perry*, 664 F.3d at 1362.  The state could prohibit that solicitation because of the possibility that prisoners would defraud solicited pen pals.  *Id.* at 1366.  Emails present security concerns as significant or more than those in *Perry*.  Unlike the voluntarily solicited communication in *Perry*, emails can easily be forwarded invasively into someone's inbox, uninvited and unwanted.  Importantly, it need not be the *first* email that poses an obvious concern.  Prisoners can strike up relationships with unwitting victims or future coconspirators and only after days, weeks, or months of correspondence finally take advantage of the relationship in unlawful ways.

For those reasons, the connection between the prison policy and the prison's legitimate interests is clear.  Limiting email to approved contacts makes it harder for prisoners to use email for illicit purposes, so the policy is reasonably related to advancing prison safety, public safety, and protecting prison resources.  It is no different than prison officials' restricting inmates to calling only ten people, each of whom must be approved after a

background check confirming they have no criminal record. *Pope*, 101 F.3d at 1384–85. That restriction is reasonably related to reducing criminal activity and harassment, *id.*—just like the email-contact restriction.

**b.** Because the policy is reasonable, that is enough to end the inquiry. *See Rodriguez*, 38 F.4th at 1331. But consideration of the other *Turner* factors only confirms that conclusion.

Consider whether inmates have "alternative means" of exercising the right to communicate with people outside the prison. Of course they do. No "exact, one-for-one substitute[]" is required, *Prison Legal News*, 890 F.3d at 972, and "adequate alternatives can exist even where prisoners are cut off from unique and irreplaceable activities," *id.* at 973 (quotations omitted and alteration adopted). Handwritten letters—which pose less severe safety concerns—are not restricted to approved visitors. That allows prisoners an adequate alternative to exercise the right at issue. Plus, prisoners can still email the outside world— just not *the entire* outside world.

**c.** The third *Turner* factor, the impact of accommodation on prison resources, underscores why the email-contact restriction is reasonable. Increased email correspondence would require increased screening by prison officials, placing greater strain on

32

prison resources and diverting them from other uses. Prison officials would have to closely monitor all outgoing emails and then all ongoing conversations forever, for all imaginable indications of criminality or code language. Both the volume and substance of reviewable emails could grow exponentially.

This Court has recognized similar impacts on prison resources many times. A prison could require postcard-only mail, for example, because "abandon[ing] the postcard-only policy would force the jail to dedicate more time and resources to searching the mail, which would detract from the officers' other duties related to security and inmate welfare." *Id.* (parenthetical quotation of *Simpson v. Cnty. of Cape Girardeau*, 879 F.3d 273, 281 (8th Cir. 2018)). Allowing a problematic magazine in a prison, for another example, would require the prison "to allocate more time, money, and personnel in an attempt to detect and prevent security problems engendered by the ads in the magazines." *Id.* And prisons could prohibit prisoners from soliciting pen pals because "a significant increase in mail would require the [Department of Corrections] to shift correctional staff to review the increased volume of mail and to shift inspectors to investigate possible pen pal scams." *Perry*, 664 F.3d at 1366. Just as in those decisions, the increased "burden [here] would make it more difficult for the

33

already overworked staff and inspectors to accomplish their other responsibilities in ensuring a safe and secure prison environment." *Id.*

It is not mere speculation that the number of emails would increase if the email-contact restriction were lifted—or that prisoners would deliberately try to take advantage of it. Benning *himself* testified that before the email-contact restriction was implemented he had "started broadly" sending "hundreds of letters" soliciting people to email him. Doc. 64-3 at 56. In his own words, "[a]nybody in the world" could have emailed with him. *Id.* That only proves the obvious: it is undeniable that prisoners would "adapt" to take advantage of a security gap allowing them to email with anyone in the world. *Florence*, 566 U.S. at 328. That would of course impact prison resources—not to mention threaten prison and public safety.

**d.** The fourth *Turner* factor, the availability of alternative prison policies, also shows the reasonableness of the email-contact restriction. A plaintiff faces "a high standard" when it comes to showing a qualifying alternative. *Rodriguez*, 38 F.4th at 1332 (quotation omitted). A "proposed alternative must be a simple and unmistakably effective choice," *id.*, that "fully accommodates the prisoner's rights at a *de minimis* cost to valid penological

34

interests," *Turner*, 482 U.S. at 91. There simply are no alternatives like that. The way to address concerns about prisoners being allowed to email everyone is to restrict who prisoners can email. An alternative that does *not* do that is necessarily not equally effective; lifting the email restriction "would introduce the exact risk of harm the prison is working to prevent." *Rodriguez*, 38 F.4th at 1334.

Nor is it enough to merely propose alternative ways of restricting emails. Alternative forms of email restrictions do not "fully accommodate[]" the prisoners' desired activity. *Turner*, 482 U.S. at 91. And alternative forms of restriction that still increase the costs of screening—and the possibility for security threats— are not a "*de minimis* cost." *Id.* Regardless, conceding that emails *do* need to be restricted, but just in some other way, concedes the dispositive issue that there is a rational connection and amounts to nothing more than "nitpick[ing]" the details of a prison policy. *Rodriguez*, 38 F.4th at 1333. Which is exactly what courts cannot do. *See, e.g., id.*

### 2. The district court's contrary view is barely colorable.

Although the district court wrongly held that *Turner* does not supply the appropriate standard, the district court nevertheless

held, in the alternative, that the email-contact restriction does not even satisfy *Turner*. Doc. 175 at 20–24. Along the way, the court improperly shifted the burden, eschewed deference to prison officials, invented its own policy rationales, and treated emails as being the same as letters. The court got things wrong at every step.

**a.** Out of the gate, the district court made a key error that plagued its entire order: it improperly shifted the burden to the Commissioner. Relying on an unpublished opinion, the court reasoned that the email-contact restriction must not be rational because the Commissioner "offered no specific evidence to show why the email-contact restriction is reasonable." Doc. 175 at 21–22. But binding precedent has unambiguously held that "the burden 'is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.'" *Pesci*, 935 F.3d at 1166 (quoting *Overton*, 539 U.S. at 132); *see also O'Lone*, 482 U.S. at 350 (holding it was error to place the "burden on prison officials to disprove the availability of alternatives"); *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977) ("the burden was not on [prison officials] to show affirmatively" a danger to prison security); *Prison Legal News*, 890 F.3d at 974 n.17 (similar); *Rodriguez*, 38 F.4th at 1330 ("To succeed on a

36

constitutional claim, *an inmate must show …. .*") (emphasis added); *Davila v. Gladden*, 777 F.3d 1198, 1213 (11th Cir. 2015) ("[D]espite the *lack of evidence the Defendants offered* here" there was a rational connection) (emphasis added). Just as a matter of legal basics, "[i]f the evidence is silent … then the party with the burden fails." *Williams v. United States*, 985 F.3d 813, 821 (11th Cir. 2021); *see also Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1173 (11th Cir. 2024). Benning has the burden, so he is the party that fails.

The district court compounded its burden-shifting error by asserting "there is no evidence that emails create some threat to prison security and safety not presented by other means of offender communication with the outside world." Doc. 175 at 23. That is wrong, as already explained. *See supra* at 28–31. But more to the point, it is a "misconception," *Pesci*, 935 F.3d at 1168 (quotation omitted), to think prison officials must "present[] evidence of an actual security breach" or "establish a causal link between the [prison policy] and a reduction in violent incidents," *Rodriguez*, 38 F.4th at 1331 (quotation omitted). Courts must instead allow prison officials to "*anticipate* security problems and adopt innovative solutions." *Id.* (quotation omitted). That is

37

especially true when it comes to problems raised by new technology.

How would there even be evidence that emails present special problems if prison officials have wisely restricted them from the start?  Must prison officials let prisoners email anyone in the world, and only after someone gets hurt, then restrict emails?  The Commissioner simply doesn't have the burden the district court foisted upon him.

**b.** The district court also reasoned that using software to screen emails for key words "should be enough to alleviate the security concerns [the Commissioner] puts forward."  Doc. 175 at 22.  Because it thought that approach "should be enough," the court concluded that "the email-contact restriction is irrational." *Id.*  There is nothing redeeming about the district court's approach or reasoning.  It simply anointed itself a "super-warden." *Prison Legal News*, 890 F.3d at 965.

The court's speculation about what "should be enough" for prison security betrays several errors.  Doc. 175 at 22.  For one, it rejects all of the constitutionally required deference judges must give to prison officials.  And remarkably, the district court asserted this policy view without *any* citation of *any* evidence, record or otherwise.  Nor does *Turner* allow courts to hold a prison

38

policy unreasonable whenever a judge speculates that some alternative "should" be good enough. *Turner* demands that alternative measures be, among other things, "unmistakably effective choice[s]." *Rodriguez*, 38 F.4th at 1332. Besides, to say that a policy is unreasonable because an alternative "should be enough" wrongly elevates the fourth *Turner* factor to a dispositive consideration. The simple existence of an alternative—even an equally effective one—does not show unreasonableness. Two approaches to prison security can be reasonable at the same time, and courts don't get to pick "whose plan is best." *Bell*, 441 U.S. at 562.

In any event, the district court was wrong about the efficacy of screening emails for key words. Doc. 175 at 22. For one, belt-and-suspenders approaches are themselves reasonable. Moreover, the court wrongly assumed that what works when emails are limited to pre-approved contacts will work when emails can be sent to anyone. When emails are restricted to family members and close associates who have been screened, reviewed, and approved by the warden, there are different concerns about the kind of content that may be emailed to them. There is, for example, less concern about fraud, blackmail, and harassment. *See Perry*, 664 F.3d at 1366. There is also less concern that the

39

emails will coordinate illegal activity because the recipients have been approved specifically because they are likely to help with the prisoner's rehabilitation. *See* Doc. 156-5 at 2, 7–11.

But once the universe of potential recipients is expanded, things change. There is a greater need to screen every email because the likelihood of any given email being dangerous increases. Screening for key words may not be enough to catch the universe of possibilities—especially if prisoners know that's the policy. *See, e.g.*, *Florence*, 566 U.S. at 328 (prisoners "adapt" to circumvent prison policies). Making matters worse, because the prison is currently required to give prisoners notice and an appeal every time their emails are censored, *see Benning*, 71 F.4th at 1332, prisoners will have constant opportunities to discern what words are being flagged and to devise ways to get around the screening.

There's also the threat of coded language, which can easily escape simple screening for key words. Without manual review by trained prison officials, there would be no way to even detect what words or hidden patterns need to be screened for. And this is not just speculation. Benning himself presented an "affidavit" from another prisoner explaining how his sister had "encrypted" emails to him by using the words "kun" and "kunning" instead of "gun"

40

and "gunning," "plown" instead of "blown," and "prains" instead of "brains," all "in order to evade detection by the algorithm that searches for key words." *See* Doc. 80-6 at 2.

Regardless, there is no evidence to suggest that screening for key words would be adequate. And the absence of evidence means Benning fails, not the Commissioner. *See supra* at 36–37.

**c.** The district court also got the third *Turner* factor wrong. The court asserted that "removing the email-contact restriction would not place some new, burdensome workload" on the Department because it "already screens outgoing emails," even though the court acknowledged that removing the restriction "could increase the number of emails" that needed to be reviewed. Doc. 175 at 22.

That conclusion is, for lack of a more charitable word, incoherent. It makes no sense to say that because prisons already review emails at volume X, there will be no extra effort to review emails at volume 2X or 3X or 4X. This Court has rejected that kind of reasoning before, pointing out that even if a "prison has an existing system of processing items from outside the prison, allowing more items through that process would indisputably impact the use of the prison's resources." *Davila*, 777 F.3d at 1213–14. An increased number of emails would mean more

41

emails getting flagged, which would increase the amount of manual review. That is necessarily true because "[o]ften an email … contain[s] a key wor[d] but in an innocuous context" and gets released only after manual review. Doc. 64-4 at 5; *see also* Doc. 64-6 at 3. That's a sufficient impact under *Turner*. *See Davila*, 777 F.3d at 1213 ("a prison need not show the extent to which a particular accommodation would impact resources, but instead only that it would have an impact").

The court's conclusion also relies entirely on its *own* assertion that software "should be enough" for prison security. Doc. 175 at 22. But it's not. *See supra* at 38–41. The court can't bootstrap its mistaken ideas about prison administration onto the third *Turner* factor to insist that there won't be any impact on prison resources. Plus, even if there were no impact on prison resources, that is not dispositive. *See Turner*, 482 U.S. at 90. A policy need not be a penny-saving effort to be reasonable.

**d.** Tellingly, the district court's own reasoning accepts that there is a rational connection between restricting prisoners' access to email and penological interests. The court reasoned that the Department can still "screen emails for flagged words and limit the number of recipients an offender can include on each email." Doc. 175 at 23. But if it is rational to limit the number of

42

recipients on each email, it is rational to restrict who can be a recipient. Both restrictions are animated by the same concerns about prison and public safety and screening demands. That "rational connection" is what is dispositive. *Rodriguez*, 38 F.4th at 1331. Once that connection is established, prison officials get to decide the details of applicable policies, not courts.

The district court's reasoning resembles an argument this Court rejected in *Rodriguez*. That decision involved a policy requiring prisoners to wear only boxers and shower shoes when being transported to prison showers. *See id.* at 1333. A prisoner argued the policy was irrational because wearing a t-shirt would not allow him any greater opportunity to hide weapons and thus "would make no difference" to prison safety. *Id.* In other words, the prisoner, like the district court, said there was some better way of doing things that wouldn't threaten prison security. But this Court rejected that argument because "[q]uite simply, limiting what prisoners wear and carry to the shower makes it harder to move weapons or contraband, [so] the policy is rationally related to advancing prison safety." *Id.* The same reasoning applies to the email-contact restriction: limiting emails makes it harder for emails to be abused, so the policy is rationally related

43

to the government's interests. *See supra* at 28–32. It's that simple.

### C. Even if *Martinez* provided the applicable standard, the email-contact restriction satisfies it.

This Court need not reach the question, but even if the district court was right to apply *Martinez*, it would not matter. Under *Martinez*, properly understood, this email-contact restriction sails through. The district court concluded otherwise only by misunderstanding *Martinez* and the difference between emails and letters.

**1.** As an initial matter, whatever continuing validity *Martinez* has, it is *not* as a form of strict scrutiny analysis or a least restrictive means test. The district court understood *Martinez* to require that prison regulations "must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Doc. 175 at 17 (quoting *Martinez*, 416 U.S. at 413). But that's a part of *Martinez* the Supreme Court has held does not apply, at all, in any context.

Most important, in *Turner* the Court quoted that same language from *Martinez* and called it "an erroneous legal standard." 482 U.S. at 93 n.*. But if that were not enough, in *Thornburgh* the Court extensively explained that part of *Martinez*

44

is no good. The *Thornburgh* Court held that it did "not believe that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test." 490 U.S. at 411.

Instead, at the very most, *Martinez* means only that when the government interest is minimal, there must be some "closer fit between the regulation and the purpose it serves." *Id.* at 412. The Supreme Court indicated that regulations cannot be "broader than 'generally necessary' to protect the interests at stake." *Id.* (quoting *Martinez*, 416 U.S. at 414). Even under that standard, *Martinez* "did not deprive prison officials of the degree of discretion necessary." *Id.* at 409. And this Court has said *Martinez* must be "tempered by" and "moderated by the wide-ranging deference due the judgment of prison authorities." *Lawson v. Singletary*, 85 F.3d 502, 511 & n.11 (11th Cir. 1996) (per curiam). Nor is there any indication that *Martinez* survives in a way that alters the baseline rule that "the burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Pesci*, 935 F.3d at 1166 (quotation omitted).

For those reasons, it is not entirely clear how much *Martinez* actually differs from *Turner*, other than possibly requiring some

45

deferential and low standard of being "generally necessary"—and even then, only when the government interest is lacking. *Thornburgh*, 490 U.S. at 412 (quotation omitted).

**2.** As for applying *Martinez*, there is a sample size of just one case: "*Martinez* itself." *Perry*, 664 F.3d at 1365. That decision provides the only data point for evaluating when a prison policy is not "generally necessary." This reinforces that *Martinez* is just the wrong standard, but regardless, the relevant comparison is between the email-contact restriction and the regulations in *Martinez*. That comparison shows the email-contact restriction must be upheld.

As already explained, the email-contact restriction is unlike the restriction in *Martinez* in every way. *See supra* at 20–24. Where the prohibition in *Martinez* was content-based, the email-contact restriction is not. Where the prohibited letters in *Martinez* could not "reasonably be expected to present a danger," *Thornburgh*, 490 U.S. at 411–12, prisoners emailing anyone they want definitely does, *see supra* at 28–31. Where the prison officials' position in *Martinez* was "not that the regulations are justified by a legitimate governmental interest but that they do not need to be," 416 U.S. at 415, the Commissioner has shown numerous "paramount" government interests, *see supra* at 27–31.

46

And where *Martinez* involved physical letters, the email-contact restriction addresses the much more concerning medium of emails.

Those differences alone are enough to show that the email-contact restriction easily satisfies whatever "generally necessary" standard *Martinez* may survive as.

**3.** The district court's justifications again hold no water. It again improperly shifted the burden—apparently in its entirety— to the Commissioner. *See* Doc. 175 at 17, 18 n.25, 20. And it again made the core error of equating letters and emails. But for all the reasons explained, in the area of security concerns, physical letters and emails are as alike as crossbows and machine guns. *See supra* at 27–31.

The district court again tried to shore up its reasoning with unsupported solutions to "obviate[]" prison security concerns. Doc. 175 at 19. In addition to its erroneous notion that emails can just be screened for key words, *see supra* at 39–41, the court also proposed that, instead of restricting who prisoners can email, prisons can just "limit offenders' emails to one recipient per message—much like handwritten letters may only be mailed to one person at a time." Doc. 175 at 18 n.25. Of course, that the court had to *manufacture* a solution to make emails and letters

47

more similar shows that they are not actually similar. Regardless, the district court misses the point. Yes, an email can be limited to one recipient at a time—but those emails can be rapidly reproduced and sent back to back to back with only a few mouse clicks. Besides, even if an email is restricted to just one recipient, it can then be forwarded to countless recipients *instantly*.

All of this just proves the court's erroneous approach. Nothing in *Martinez* lets courts "dictat[e] the precise course the prison officials had to follow to rectify the perceived constitutional violation." *Pope*, 101 F.3d at 1384 n.2. The question is whether there is a "closer fit between the [email-contact restriction] and the purpose it serves." *Thornburgh*, 490 U.S. at 412. There undoubtedly is a close fit between restricting who prisoners can email and the purposes of prison and public safety. *See supra* at 27–31. That's enough to satisfy whatever remains of *Martinez*.

## II. Benning's procedural due process claim should fail.

The district court also ruled that Benning's due process claim was valid and entered declaratory relief. Doc. 175 at 28. It declared that Benning has a liberty interest in outgoing emails, that he is entitled to notice, an opportunity to be heard, and a neutral decisionmaker when a prison censors an outgoing email, and that the Department of Corrections violated Benning's

48

constitutional rights.  *Id.*  That declaration was effectively compelled by this Court's decision in Benning's last appeal. *Benning*, 71 F.4th at 1329.

That decision was deeply erroneous and the Commissioner intends to seek *en banc* review to undo its holding now that there is a final judgment ready to review.  The decision, among other things, did not appropriately analyze whether Benning has a liberty interest (he does not), failing even to address *Sandin v. Conner*, 515 U.S. 472, 484 (1995), which provides the test for whether there is a liberty interest at all.  The panel also ignored *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976), which would make absolutely clear that whatever minimal liberty interest Benning might have is not nearly sufficient to entitle him to special procedures.  *See also Thornburgh*, 490 U.S. at 410 n.9 (undermining the basis on which *Martinez* purportedly found a First Amendment right).  But because the panel ruled as it did, the Commissioner acknowledges that a full hearing on those arguments is futile at this stage.

49

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court.

Respectfully submitted.

/s/ *Elijah J. O'Kelley*

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Elijah J. O'Kelley
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov
*Counsel for Defendant-
Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 10,058 words as counted by the word-processing system used to prepare the document.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley